GREGORY CHARLES, ESQ., BAR NO. 208583
CAMPEAU GOODSELL SMITH
440 North First Street, Ste. 100
San Jose, California 95112
Telephone: 408.295.9555
Facsimile: 408.852.0233
gcharles@campeaulaw.com

Counsel for Excel Innovations, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE:<br><br>HSR GENERAL ENGINEERING CONTRACTORS, INC.,<br><br>    DEBTOR. | Case No. 10-58737<br><br>Chapter 11<br><br>Adversary No. 10-05309 |
| HSR GENERAL ENGINEERING CONTRACTORS, INC.,<br><br>    PLAINTIFF,<br><br>    V.<br><br>SAFECO INSURANCE COMPANIES,<br><br>    DEFENDANT. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR A PRELIMINARY INJUNCTION**<br><br>**HONORABLE CHARLES NOVACK**<br><br>**DATE: TBD**<br>**TIME: TBD:** |

## I. INTRODUCTION AND SUMMARY OF THE RELIEF SOUGHT

This adversary proceeding arises from First National Insurance Company's ("First National") willful hindrance of the HSR General Engineering Contractors, Inc.'s ("HSR") efforts to collect monies necessary for the reorganization of the debtor's estate. Specifically, without any justification in either law or fact, it sent notices to HSR's customers directing HSR's customers to "cease and desist" making any payments to HSR. These actions precipitated the instant bankruptcy. Since its purported lien is preferential, First National now claims that the monies owed to HSR are actually a trust fund that only can be used to reimburse First National and finish jobs that it has bonded. Post petition, First National refuses to retract its letters. Thus, its willful conduct stands in violation of the

automatic stay, and intervention of the Court is necessary.

## II. STATEMENT OF FACTS

### A. THE PARTIES

On or about January 2, 2008, HSR and Safeco Corporation ("Safeco") into a General Indemnity Agreement for Contractor ("Agreement") (Dorsa, Decl., Ex. 1, ¶ 2). The other parties to this litigation are Liberty Mutual Group ("Liberty Mutual") and First National. In or about July, 2008, Liberty Mutual acquired Safeco. The exact relationship between these defendants and First National, however, is not clear. For example, Safeco recorded a UCC Financing Statement (10-7233237705) on May 26, 2010 (Dorsa Decl., Ex. 2). Consequently, HSR listed Safeco as a creditor, gave it notice of this bankruptcy at the address listed on the statement and named it a defendant in the original complaint filed in this matter.

First National, however, filed an objection to HSR's motion for permission to use cash collateral claiming that it is a creditor in the underlying bankruptcy but failed to offer any evidence that it has any rights stemming from the Agreement and contradicts the financing statement filed in the name of Safeco.

> First National is the Debtor's performance and payment bond surety in connection with various public works construction projects located in Northern California. In the papers filed by the Debtor to date, including the Motion, the Debtor fails to mention First National by name. Debtor erroneously lists "Safeco Insurance Companies, 4333 Brooklyn Ave NE, Seattle, WA" instead of naming First National and listing First National's address. Although both First National and Safeco Insurance Companies are now part of the group of companies under the umbrella organization called "Liberty Mutual Group," the companies are not interchangeable, and the Debtor was and is well aware that First National is the interested party in this proceeding, and was and is well aware of First National's contact information (Doc. No. 21).

Again, HSR used the contact information that the defendants listed on the financing statement.

### B. RELATIONSHIP BETWEEN THE PARTIES.

Pursuant to the Agreement one or more of the defendants issued the following payment and performance bonds for public works projects ("Bonded Jobs").

| Bond No. | Date | Sum | Project |
|---|---|---|---|
| 6500532 | 3/27/08 | $4,877,862 | City of Gilroy Camino Arroyo Bridge Project, |

|          |         |              | Phase II |
|----------|---------|--------------|----------|
| 6500547  | 6/17/08 | $2,269,000   | San Jose/Evergreen Community College District Lake Renovation - Evergreen Valley College |
| 6576823  | 3/20/09 | $757,212     | California Department of Transportation 05-0P8104, 05-SCr-17-7.017.3 |
| 6576828  | 4/3/09  | $198,894     | City of Lafayette Project No.014-9676, Mount Diablo Boulevard Multi-Purpose Pathway |
| 6576833  | 5/21/09 | $1,877,809   | Santa Clara Valley Water District Jacques Gulch Restoration Project |
| 6633445  | 6/26/09 | $3,192,308   | Presidio Trust Landfills 8 & 10 and Graded Area 9 Remediation Project |
| 6633459  | 8/25/09 | $720,173     | County of San Mateo Coyote Point Bay Trail Improvements (Project No. E4861000) |
| 6576820  |         |              | CDOT – Night paving |

Claims have been made on the bonds. As of the petition date, the defendants claim to have paid $233,244 and incurred costs and expenses totaling $17,530 (Dorsa Decl., ¶3, Ex. 3),

HSR is cognizant of this fact and endeavored to resolve the claims. For example, HSR made a proposal on June 30, 2010 that would settle all open claims on the City of Gilroy Project (Bond No. 6500532). On this project, the City of Gilroy is withholding $444,914.17 in undisputed monies from HSR. Additionally, the city is withholding $23,664.15 in disputed change order monies. The current undisputed amount owed to subcontractors on the project totals $521,676.99. The disputed amount owed to subcontractors is $14,048.40 (Dorsa Decl., ¶4).

Since it is obligated to do so under the bond, HSR asked the defendants to make payment to contractors of $61,814.14 and $96,672.20. The parties receiving these payments agreed to release their payment bond claims and stop notices on the project. HSR would authorize the City of Gilroy to release joint checks to the remaining subcontractors who would release their payment bond claims and stop notices on the project. At that point, the City of Gilroy would remit $81,723.52. HSR agreed to pay that amount to the defendants who would then be owed $76,762.82. HSR then offered to pay this balance over six months (Dorsa Decl., ¶5).

The defendants refused and demanded a proposal that would bring a global resolution to all claims. While HSR asked the defendants to honor their obligations under the bonds, so it could resolve the claims on a case by case basis, the defendants would do nothing without a proposal resolving all claims (Dorsa Decl., ¶6). Thereafter, First National sent eight stop payment notices

corresponding to the Bonded Jobs. (Dorsa Decl., Ex. 4). Although the defendants do not stand in privity with HSR's customers, the notices instruct the customers to "cease and desist" making payments to HSR. The defendants cite no legal authority for this act and cannot as the letters simply reflect an act of self-help that is barred by California law.

Moreover, the letters are causing irreparable harm to HSR because its customers do not know whom to pay. Consequently, no payments are being made, and HSR cannot complete its open projects. For example, there are no open payment bond claims on the Coyote Point Bay Trail Improvements, and completion of the project would yield a $91,368.81 positive differential between projected revenue and costs (Dorsa Decl., ¶7, Ex. 5).

On the Presidio Trust project, claims have been made, but remaining funds on the project are sufficient to pay all subcontractors and vendors. In fact, projected revenue exceeds estimated costs by $282,110.01. On the Jacques Gulch Restoration Project, two claims are pending but there is an $85,410.66 positive differential between projected revenue and costs (Dorsa Decl., ¶8, Ex. 5). HSR demanded withdrawal of the notices, but First National refused (Dorsa Decl., ¶9).

While these issues certainly present difficulties, the cease and desist letters have jeopardized an additional project for which HSR is the low bidder). In fact, San Mateo County conditioned award of a new project contingent upon removal of the stop notice payment (Dorsa Decl., ¶10, Ex. 6).

The parties then negotiated a funds control agreement on the Coyote Point project that would allow removal of the stop notice payment on that project. First National would withdraw the stop letter on that project and remove an impediment the new project. First National, however, reneged on the agreement and required funds control on all projects.

> First National has nonetheless offered to work with HSR to establish a funds control procedure whereby the remaining contract funds on the bonded projects would be used to pay bonded payables and First National would withdraw its hold funds letters to the project owners. Accordingly, by separate cover First National's attorney will transmit a proposed "Funds Control Agreement" between First National and HSR to HSR's counsel. **As you will note, it includes all bonded projects, rather than the Coyote Point Project only**. First National believes that a single agreement is preferable to piecemeal agreements on an individual project basis. We look forward to your response thereto ((Dorsa Decl., ¶11, Ex. 7, p. 7).

The correspondence is also notable in one other aspect. The claimed recitation of facts suggests that

HSR and its counsel were non-responsive to First National's requests, but it ignores an unstated yet undeniable fact. While HSR offered many proposals to resolve pending claims, First National would only consider a proposal that included a global resolution of all claims.

### III. ARGUMENT

#### A. THE FUNDS ARE PROPERTY OF THE ESTATE.

Section 541(a) of the Bankruptcy Code provides that the "estate is comprised of all the following property, wherever located and by whomever held ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1). The Supreme Court views this not as a limitation of what is included in the estate but as a broad, inclusive definition. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983). The Bankruptcy Code does not provide a definition for either the term "property" or the term "interest in property." However, those terms should be construed extremely broadly, encompassing virtually every right that a debtor has at the time of filing. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). Therefore, the funds are property of the estate.

#### B. SINCE *PEARLMAN V. RELIANCE INSURANCE COMPANY*, 83 S.CT. 232 (1962) IS NOT APPLICABLE TO THIS DISPUTE, THE DEFENDANTS HAVE NO INTEREST IN THE FUNDS.

In its objection to HSR's cash collateral motion, the defendants cite *Pearlman v. Reliance Insurance Company 10*, 83 S.Ct. 232 (1962) for the following proposition.

> If a principal defaults on its bonded obligations, the surety is equitably subrogated to all of the rights of the principal, the obligee, and any person receiving payment under the applicable bond. See *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132 (1962); *In re E.R. Fegert, Inc.*, 88 B.R. 19 258 (9th Cir. BAP 1988), affd, 887 F.2d 955 (9th Cir. 1989); *In re Alliance Properties, Inc.*, 104 20 B.R. 306 (Bankr. S.D. Cal. 1989). A surety's equitable subrogation rights are superior to a perfected security interest such as a security interest created pursuant to Section 9 of the California Commercial Code. See *In re Larbar Corp., 177 F.3d 439* (6th Cir. 1999); *Framingham Trust Co. v. Gould-National Batteries, Inc.*, 427 F.2d 856 (lst Cir. 1970); *National Shawmut Bank of Boston v. New Amsterdam Casualty Co.*, 411 F.2d 843 (lst Cir. 1969); *Central National Ins. Co. of Omaha v. Tri-County State Bank*, 823 F.Supp. 652 (D. Minn. 1993); *In re Ward Land Clearing & Drainage, Inc.*, 73 B.R. 313 (Banky; N.D. Fla. 1987). These rights relate back to the date of the issuance of the

*Bonds. Larbar*, 177 F.3d at 443-44.

The defendants' reliance upon non-applicable authority is understandable because California law specifically contradicts this assertion.

In *Pearlman,* the Supreme Court addressed a dispute between the trustee in bankruptcy of a government contractor and the contractor's payment bond surety over which had the superior right and title to a fund withheld by the Government out of earnings due the contractor. If a surety pursuant to the Miller Act pays a subcontractor, the surety has a subrogated right to contract balances. This instant, however, dispute does not involve the Miller Act. Since state law determines the rights of the parties, *Pearlman* does not apply.

In *American Fidelity Fire Ins. Co. v. U.S.*, 385 F.Supp. 1075 (N.D. CA 1974), a contractor's surety brought action against the United States, State of California and others seeking a determination that it was entitled to certain funds due from the state under a public works contract. The United States contended that the funds were property of the estate, and its tax lien primed any rights that the surety had. Notably, the contractor asserted the same arguments as the defendants, and the analysis by the district court demonstrates that the defendants in this matter are nothing but unsecured creditors.

> In support of its position that Turner had no property or property rights to which the federal tax liens could attach, Surety contends that, upon its payment of the laborers' and materialmen's claims against Turner, the defaulting contractor, it was subrogated to their rights to any monies due and owing to Turner (citing *Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) and *Home Indemnity Co. v. United States*, 313 F.Supp. 212 (W.D.Missouri 1970); that its subrogation related back to the date of the suretyship agreement and the execution of its bonds (citing *County of San Diego v. Croghan*, 2 Cal.App.2d 494, 38 P.2d 474 (1934)) and that, by virtue of this subrogation and relation back, it succeeded to Turner's interest in the contract payments as of the date of the execution of its suretyship agreement and that there was nothing left to which the later filed federal tax lien against Turner could attach.
>
> It is well established that a surety, upon satisfying the debts of the principal, is subrogated only to such rights as the creditors had against the principal. Cal.Civil Code § 2848; *United States Fidelity and Guaranty Co. v. Oak Grove School District*, 205 Cal.App.2d 226, 230-234, 22 Cal.Rptr. 907 (1962). **It has now been held in California that, if the surety**

> on a public works contract becomes liable to the contractor's laborers and materialmen, the surety is subrogated to the contractor's right to the public entity contract funds only if the laborers and materialmen have perfected their stop notice claims. *Pacific Employers Insurance Co. v. California*, 3 Cal.3d 573 (1970); 91 Cal.Rptr. 273, 477 P.2d 129.
>
> In *Pacific Employers* no stop notices were filed. In the pending case two stop notices were filed- only one of which was eventually perfected. The argument could conceivably be made that the filing of even a single stop notice should put the public entity on notice that the contractor is defaulting and that it should withhold the unpaid balance. Under this reasoning, the surety should then be allowed to be subrogated to the rights, not only of the lone stop notice claimant, but to the rights of those other unpaid laborers and materialmen whom the surety must reimburse under its bond. However, Cal.Civil Code § 3187 makes clear that disbursing officers of public entities have no duty to anticipate the filing of future stop notices and that final payment can be made to the contractor even though the stop notice period has not expired. *Pacific Employers, supra*; See also California Mechanic's Liens and Other Remedies, Cal. Continuing Education of the Bar, 1972, § 11.6 at 267. 385 F.Supp. 1075, 1077 -1078

Here, First National has paid $233,244 and incurred costs and expenses totaling $17,530, but all payments have been made pursuant to bond claims. No payments have been made to a subcontractor who issued a stop notice and timely filed a lawsuit to foreclose on the lien. If First National makes such a payment, then it will be subrogated to the rights of that party but nothing more.

### C. SINCE SAFECO'S LIEN IS PREFERENTIAL, ITS "TRUST FUND" THEORY IS INAPPLICABLE

The defendants then rely upon foreign authority and claim that the funds are held in trust.

> Finally, by virtue of a trust fund provision such as the one in the Indemnity Agreement here, all bonded contract funds must be used to pay the claims of the beneficiaries of the trust, and for no other purpose, until such claims are paid in full. See *Universal Bonding Ins. Co. v. Gittens and Sprinkle Enterprises, Inc.*, 960 F.2d 366 (3d Cir. 1992) (holding that a debtor in possession may not use contract funds to make payments to general unsecured creditors or to further its reorganization efforts, but must first use such funds for the benefit of unpaid subcontractors and suppliers). These beneficiaries include the Debtor's unpaid subcontractors and suppliers on bonded projects or, alternatively, First National to the extent that it pays the claims of such subcontractors and suppliers. See id.

*American Fidelity* also addresses this issue.

Finally, Surety argues that, even if Turner had an interest to which the tax liens could attach, the assignment to surety pursuant to its General Agreement of Indemnity of all of Turner's rights under the contract, including the right to payment, in the event of the contractor's default or breach of the contract and/or bond takes priority over the federal tax liens.

Once it is determined that a taxpayer has a state created interest to which the tax lien can attach, the priority of competing liens must be determined according to federal law. Acquilano, supra. Federal law (26 U.S.C. § 6323 (a)) provides that only certain stated categories of interests, i.e., security interests, mechanic's liens, and judgment liens, have priority over federal tax liens.

The only one of these categories into which Surety's assignment interest could possibly fall is that of a security interest. We are of the opinion that the assignment to surety pursuant to its agreement was an account or contract right within the meaning of Cal.Commercial Code § 9106 and, as such, a security interest subject to the provisions of Division 9 of the Cal.Commercial Code.

However, 26 U.S.C. § 6323(h)(1) requires that in order for an interest to qualify as a security interest the particular interest must be such as would be protected by state law against a subsequent judgment lien.

But Sections 9301 and 9302 of the Cal.Commercial Code provide that, with respect to such security interests in accounts and contract rights, any lien creditor, including a judgment lien creditor, will have priority over the secured interest unless a financing statement has been filed.

Apparently no such financing statement was filed by Surety with the Secretary of State with respect to the assignment in question; therefore, plaintiff Surety was not a holder of a 'security interest' protected by state law against a subsequent judgment lien within the meaning of Internal Revenue Code Sections 6323(a) and 6323(h)(1) and its security interest remained subordinate to the tax liens of the United States. 385 F.Supp. at 1078 -1079.

While Safeco did file a financing statement, it did so during the preference period. Thus, the lien is avoidable.

### D. THE CEASE AND DESIST LETTERS VIOLATE THE AUTOMATIC STAY.

Upon the filing of a bankruptcy petition, the automatic stay arises as a matter of law. 11 U.S.C. § 362(a). Section 362(a) lies at the heart of the Bankruptcy Code. It provides one of the most fundamental protections afforded to debtors by preventing the piecemeal destruction of the debtor's property. Without the stay provided by 11 U.S.C. 362(a), there would be a race to the courthouse to claim assets of the debtor, and a successful reorganization would be impossible. § 362(a) imposes an affirmative duty to

1 discontinue post-petition collection actions. *Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1216 (9th 2002).

Here, the cease and desist letters are a continuing effort by the defendants to collect money of the estate. In this context, the letters are analogous to post-petition dunning letters which is a violation of the stay. *In re Henry*, 266 B.R. 457, 470 (Bankr.C.D.Cal.2001); *In re Connor*, 366 B.R. 133, 136 (Bkrtcy.D.Hawai'i,2007).

Moreover, the defendants' conduct is willful. Specifically, *American Fidelity Fire Ins. Co.* specifically cites and distinguishes *Pearlman*. The facts are analogous and the authority is controlling. Thus, when the defendants' shepardized the case, they saw *American Fidelity Fire Ins. Co.*, but still maintain the cease and desist letters in violation of the automatic stay. HSR reserves its right to seeks sanctions at a later date.

Dated: October 13, 2010                    CAMPEAU GOODSELL SMITH
                                           A Law Corporation


                                           By:___/s/Gregory J. Charles_____
                                               Gregory Charles
                                               Attorneys for the Plaintiff

Campeau Goodsell Smith